536 F.2d 560
 Howard JAMISON, Administrator of the Estate of Leo C.
McGrath, Deceased, Appellant,
v.
MIRACLE MILE RAMBLER, INC., and Benjamin H. Kirkland,
Peerless Insurance Company, Garnishee-Appellee.
 No. 75-1749.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 22, 1976.
Decided May 19, 1976.
 
 Arthur R. Gorr, Stein & Winters, Pittsburgh, Pa., for appellant.
 George I. Buckler, James A. Mollica, Jr., Meyer, Darragh, Buckler, Bebenek & Eck, Pittsburgh, Pa., for appellee Peerless Ins. Co.
 Before KALODNER, HUNTER and GARTH, Circuit Judges.
 OPINION OF THE COURT
 GARTH, Circuit Judge.
 
 
 1
 We are called upon to determine whether the district court properly granted summary judgment to the garnishee insurance company in this proceeding by the death action verdict winner to recover so much of the judgment as exceeded the insurance coverage. We hold that the record presented disputed issues of material fact and that summary judgment was therefore improperly granted.
 
 
 2
 * On February 28, 1963 Leo C. McGrath was killed as a result of a vehicle collision with an automobile owned by Miracle Mile Rambler, Inc. (Miracle Mile) and driven by Benjamin H. Kirkland, a Miracle Mile employee. Thereafter, Howard Jamison, Administrator of the Estate of McGrath, commenced a wrongful death and survival action against Miracle Mile and Kirkland in the U. S. District Court for the Western District of Pennsylvania at Civil Action No. 63-1028.
 
 
 3
 At the time of the accident Miracle Mile had in effect an insurance policy issued by Peerless Insurance Company (Peerless) which indemnified Miracle Mile for automobile liability up to $100,000.00. In accordance with the policy Peerless undertook the defense of both Miracle Mile and Kirkland. Before as well as during trial, Peerless, on behalf of the defendants, engaged in settlement negotiations with counsel for Jamison. No settlement agreement was reached. Consequently, the case was submitted to a jury which returned a verdict in favor of Jamison and against Miracle Mile and Kirkland in the amount of $155,000.00. This judgment was duly entered on July 2, 1965.
 
 
 4
 After filing a motion for a new trial and paying the $100,000.00 policy limit plus interest into the court, Peerless terminated its representation of Miracle Mile and Kirkland. The district court denied the motion for a new trial and an appeal to this Court was filed by Miracle Mile but not pursued.
 
 
 5
 Thereafter, in June, 1967, Miracle Mile commenced suit against Peerless in the district court for the Western District of Pennsylvania (Civil Action No. 67-813) to recover the amount of its liability to Jamison in excess of the insurance coverage. This complaint, seeking $55,000.00 plus interest, alleged that Peerless, as insurer, "negligently and in bad faith refused to settle" the wrongful death action "within the policy limits of $100,000.00." Although Jamison had notice of Miracle Mile's excess judgment action against Peerless, he did not intervene nor was he joined as a party. On April 10, 1969, Miracle Mile settled its $55,000.00 action against Peerless for $7,500.00. This settlement, less counsel fees, has been retained in trust for Jamison. That same date the district court entered an order dismissing the excess judgment action (Civil Action No. 67-813) with prejudice pursuant to the stipulation and release entered into by Miracle Mile and Peerless.
 
 
 6
 Thereafter, on April 21, 1969, Jamison filed a praecipe for a writ of execution at Civil Action No. 63-1028 (Execution No. 4637) naming Peerless as garnishee. This praecipe alleged that the garnishee, Peerless, had failed "to act in good faith and without negligence" in its handling of Jamison's wrongful death action against Miracle Mile, which thereby resulted in a judgment in excess of the insurance coverage. Finally, the praecipe stated that this execution attachment constituted an assignment to Jamison of the excess judgment claim allegedly owing from Peerless to Miracle Mile. The writ of execution was issued by the district court pursuant to the praecipe on April 21, 1969.
 
 
 7
 Peerless answered this praecipe by alleging, among other affirmative defenses, the settlement and dismissal with prejudice of Miracle Mile's excess judgment action (Civil Action No. 67-813).
 
 
 8
 To establish the garnishment claim, Jamison sought discovery of the negotiations which resulted in the settlement of the $55,000.00 excess judgment suit for $7,500.00 as well as discovery of the unsuccessful settlement discussions in the underlying wrongful death action. Jamison attempted to depose George Buckler, Esq., who had been Peerless' counsel and had represented Miracle Mile and Kirkland in the wrongful death action and Peerless in the excess judgment action.
 
 
 9
 Peerless moved for a protective order to preclude the taking of an oral deposition of its counsel on the ground that discovery would cause "unreasonable annoyance and undue burden." On June 4, 1971 the district court granted the protective order on the basis that Jamison was seeking to discover work products and "failed to show sufficient cause to overcome the general exclusion of work products from disclosure."
 
 
 10
 Thereafter Peerless moved for summary judgment based upon its affirmative defenses. In a memorandum and order entered May 8, 1975, the district court granted summary judgment in favor of the garnishee Peerless concluding, as a matter of law, that a debt owing from Peerless to Miracle Mile no longer existed. Although attachment execution was an appropriate procedure under Pennsylvania law for Jamison to assert Miracle Mile's right to a debt owed by Peerless, the district court held that no such debt existed following the settlement and dismissal with prejudice of the excess judgment suit. Thus, under the district court's analysis, nothing remained for Jamison to attach and garnish.
 
 
 11
 The district court also held that this garnishment proceeding was barred by the doctrine of res judicata inasmuch as it involved the identical issues which were settled by the dismissal with prejudice of the excess judgment suit.
 
 
 12
 As an additional basis for its grant of summary judgment in favor of Peerless, the district court rejected Jamison's claim that the $7,500.00 settlement was the product of collusion between Miracle Mile and Peerless, was "analogous to a fraudulent debtor's conveyance," and was therefore unfair. The district court, in its opinion, did not address the allegations of either collusion or a fraudulent conveyance. It answered the unfair amount argument by saying:
 
 
 13
 We find no basis for such an assertion and to the contrary, since this Court presided over the primary trial and had knowledge of the settlement negotiations we deem the Miracle Mile Peerless settlement to be quite equitable under the circumstances.
 
 
 14
 Jamison filed a timely notice of appeal from the district court's order of May 8, 1975. We have jurisdiction pursuant to 28 U.S.C. § 1291.
 
 II
 
 15
 Under Pennsylvania law, which governs the interpretation of the Miracle Mile Peerless insurance agreement in this diversity action,[1] an insurance contract provides not only for indemnity, but also "operates at the same time to create an agency relationship in its provision for the insurer's exercise of control over the disposition of claims against the insured . . . whether that be by settlement or litigation." Cowden v. Aetna Casualty and Surety Co., 389 Pa. 459, 134 A.2d 223, 228 (1957). The insurer must therefore "act with the utmost good faith toward the insured in disposing of claims against the latter." Id. Thus, in the factual situation presented here, Miracle Mile, as the insured, could assert a cause of action against Peerless, the insurer, for failure to conduct the wrongful death litigation "with the utmost good faith."
 
 
 16
 This Court has recognized that under Pennsylvania law, "(a)n attachment execution works an assignment to the plaintiff of the debt due the defendant from the garnishee." In re Boyd's Estate, 394 Pa. 225, 146 A.2d 816, 825 (1958), quoted in Shaw v. Botens, 403 F.2d 150, 153 (3d Cir. 1968). Therefore, in Shaw v. Botens, supra, this Court held that the death action verdict winner, by commencing attachment and garnishment proceedings, could assert as an assignee of the insured the insured's claim against the insurer for failure to conduct the death action "with the utmost good faith."
 
 
 17
 Here, the death action verdict winner, Jamison, attempted to garnish a debt allegedly owed by the insurer, Peerless, to the insured, Miracle Mile, after the insurer and the insured had already effected a settlement of the debt. Jamison argues that the district court erred in granting summary judgment for the following reasons: (1) there existed an issue of material fact for trial; (2) the protective order precluded Jamison from obtaining needed discovery; (3) Miracle Mile lacked power to release the claim against Peerless without the consent of Jamison; and (4) Jamison, despite the Miracle Mile Peerless settlement, could assert Kirkland's rights against Peerless. Since we find merit in Jamison's first and second arguments, we must reverse the district court's order.
 
 III
 
 18
 At the outset of our discussion we observe that despite Jamison's evident interest in the excess judgment action, no attempt was made by him to intervene and no effort to join Jamison as a party was ever undertaken by either Miracle Mile or Peerless. The Federal Rules of Civil Procedure allow for such participation in a single proceeding in the interests of judicial efficiency. See Fed.R.Civ.P. 19, 24. Nevertheless, neither of the available procedures were utilized, and we cannot help but register our disturbance at that fact. However, despite our disturbance, in light of the record presented, we are not disposed to permit the parties' inaction to affect our resolution of this case.
 
 
 19
 Under Fed.R.Civ.P. 56(c), the district court shall grant summary judgment
 
 
 20
 if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.
 
 
 21
 Once a motion for summary judgment is made and supported by supporting papers,
 
 
 22
 an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.
 
 
 23
 Fed.R.Civ.P. 56(e).
 
 
 24
 Peerless moved for summary judgment based upon the settlement and dismissal with prejudice of Miracle Mile's excess judgment suit.[2] In essence, Peerless argued that Jamison, as assignee by operation of law of the Miracle Mile claim against Peerless, could assert "no greater right" than was vested in Miracle Mile at the date the praecipe for writ of execution was served. Folmar v. Shaffer, 232 Pa.Super. 22, 332 A.2d 821, 823 (1974); Restatement of Contracts, § 167 and Comment (1)(a) (1932). As of the date of service, May 15, 1969, Miracle Mile and Peerless had settled the excess judgment suit, and the district court had dismissed the action with prejudice. A dismissal with prejudice "constitutes an adjudication of the merits as fully and completely as if the order had been entered after trial." Gambocz v. Yelencsics, 468 F.2d 837, 840 (3d Cir. 1972). Since Miracle Mile was precluded by the principle of res judicata from relitigating its claim against Peerless, Peerless asserted that Jamison, as assignee, was similarly bound.
 
 
 25
 However, Pennsylvania law recognizes an exception to this rule. Under Pennsylvania law an assignee's rights are not extinguished where the assignor has acted fraudulently. In Folmar v. Shaffer, supra, 332 A.2d at 823, the Pennsylvania Superior Court stated:
 
 
 26
 . . . an attaching creditor necessarily claims through his debtor, and in the absence of fraud, can claim no greater right than was vested in the latter at the time the writ was served on the garnishee . . . . (Emphasis added.)
 
 
 27
 See also Renschler v. Pizano, 329 Pa. 249, 198 A. 33 (1958).
 
 
 28
 We must therefore focus our inquiry on whether Jamison's submissions to the district court were sufficient to create a factual issue of fraud so as to come within the Folmar exception and defeat Peerless' motion for summary judgment.
 
 
 29
 Jamison, in an unsworn answer to the motion for summary judgment, alleged that the Miracle Mile Peerless excess judgment settlement "involved collusion" and was "analogous to a fraudulent debtor's conveyance." Had Jamison relied exclusively upon these allegations, unsupported by affidavits or other documents as provided in Fed.R.Civ.P. 56, it is questionable whether he would have raised an issue of material fact. See Sound Ship Building Corp. v. Bethlehem Steel Co., 533 F.2d 96 (3d Cir. 1976). However, Jamison also submitted the sworn deposition of Harry H. Waldman and Henry J. Schmelz, the former president and comptroller respectively of Miracle Mile. Their statements, which have not been controverted, indicate that as of the date of the deposition, September 10, 1968, Miracle Mile was no longer transacting business and its liabilities exceeded its assets by over $100,000.00.[3] Thus, it appears that seven months before Miracle Mile and Peerless settled the excess judgment suit, Miracle Mile was insolvent and no longer transacting business.
 
 
 30
 The fact of Miracle Mile's insolvency is crucial to Jamison's case because of its relevancy to the question of fraud in the settlement of the excess judgment suit. In Pennsylvania a conveyance[4] is fraudulent when a party is insolvent and conveys property for less than a fair consideration.[5] 39 P.S. § 351 et seq.[6] As we have observed, the depositional testimony which was not contradicted reveals that Miracle Mile was hopelessly insolvent prior to the challenged settlement. Thus the first element of a fraudulent conveyance under Pennsylvania law was satisfied.
 
 
 31
 Furthermore, Jamison made the requisite showing to put the element of fair consideration into issue. First, to establish the merits and value of the excess judgment claim, he filed an affidavit asserting that he would have settled the wrongful death action for the policy limits of $100,000.00, but that prior to the verdict, Peerless refused to settle for that amount. This affidavit, which was not contradicted, implicitly raised the factual issue of whether Peerless had defended Miracle Mile "with the utmost good faith."[7] Thus Jamison's argument that Miracle Mile possessed a meritorious $55,000.00 excess judgment claim against Peerless directly called into question the fairness of the consideration.[8] The second element of the Fraudulent Conveyance Act was thereby satisfied.
 
 
 32
 Our analysis leads to the conclusion that material issues of disputed fact supporting Jamison's allegations of fraud in the Miracle Mile Peerless settlement have been properly raised. Thus, Jamison brought himself within the rule of the Folmar case, supra, and precluded the entry of judgment in favor of Peerless as a matter of law.
 
 
 33
 Moreover, the record indicates that the district court prevented Jamison from deposing Buckler, Peerless' attorney. The district court's protective order entered on Buckler's motion was based exclusively on the ground that work product is not discoverable absent good cause shown. We believe the district court erred in both the entry and breadth of its order.
 
 
 34
 First, we find nothing in the record indicating that discovery was sought of "work product." Buckler's motion does not even mention the term, but instead seeks relief based upon mootness and harassment. Second, Jamison's brief indicates that certain papers relevant to this proceeding have already been filed by Buckler in the various court proceedings and Jamison seeks to depose Buckler with respect to them.
 
 
 35
 Finally, we question the scope of the protective order which bars Jamison from all interrogation of Buckler. By the very nature of this type of litigation, we have difficulty in comprehending how a plaintiff can prepare his case without such discovery.[9] See Bell v. Commercial Insurance Co., 280 F.2d 514 (3d Cir. 1960). There will be ample opportunity for legitimate objections to be raised during depositions if the plaintiff transgresses into forbidden areas. Those objections can be ruled on as they occur without the blanket prohibition imposed here.
 
 
 36
 As we indicated earlier, our disposition of this case makes it unnecessary for us to reach the other issues raised by Jamison. We will therefore vacate the district court's protective order of June 4, 1971 which barred the oral deposition of George Buckler, and we will reverse the district court's order of May 8, 1975 granting summary judgment in favor of Peerless and will remand for further proceedings consistent with this opinion.
 
 
 
 [1]
 Since the district court's jurisdiction was based upon diversity of citizenship, it was required to apply the choice of law rules of the forum state, Pennsylvania, in construing the Miracle Mile Peerless insurance contract. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under traditional Pennsylvania law, interpretation of an insurance contract is governed "by the law of the state where the contract was made." Crawford v. Manhattan Life Ins. Co. of N. Y., 208 Pa.Super. 150, 221 A.2d 877, 880 (1966). "The place of making an insurance contract is the place of delivery . . . (and) (i)n the absence of any proof as to the place of delivery, in the case of life insurance contracts, there is a presumption of delivery at the residence of the insured." 221 A.2d at 880-81
 The pleadings indicate that Miracle Mile is incorporated and located in Pennsylvania and that Peerless, a company domiciled in New Hampshire, also engages in business in Pennsylvania. In the absence of evidence as to the place of delivery of the Miracle Mile Peerless insurance contract, the contract is presumed to have been delivered and made in Pennsylvania. Thus, Pennsylvania law governs the construction of the insurance agreement. Bell v. Commercial Ins. Co., 280 F.2d 514, 515 (3d Cir. 1960); Roth v. Maryland Cas. Co., 209 F.2d 371, 373 (3d Cir. 1954).
 
 
 [2]
 A copy of the release executed by Miracle Mile in favor of Peerless and a certified copy of the district court's dismissal with prejudice of the Miracle Mile Peerless suit (Civil No. 67-813) were submitted with the summary judgment motion
 
 
 [3]
 Schmelz testified that Miracle Mile was unable to pay the excess judgment of $55,000.00 plus interest and that Miracle Mile did not show this excess judgment as a liability on its books. Exclusive of that liability, Miracle Mile's liabilities exceeded its assets by $48,000.00. Joint App. 135a, 143a
 
 
 [4]
 A "conveyance" includes
 . . . every payment of money, assignment, release, transfer, lease, mortgage, or pledge of tangible or intangible property, and also the creation of any lien or incumbrance.
 
 
 [39]
 P.S. § 351
 
 
 [5]
 "Fair consideration" is given for property or an obligation
 (a) When, in exchange for such property or obligation, as a fair equivalent therefor and in good faith, property is conveyed or an antecedent debt is satisfied
 
 
 [39]
 P.S. § 353
 
 
 [6]
 Under the Uniform Fraudulent Conveyance Act,
 Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent, is fraudulent as to creditors, without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration.
 
 
 [39]
 P.S. § 354
 
 
 [7]
 We recognize that without more, a judgment that exceeds the policy limits does not raise an inference of bad faith. Here of course the circumstances in addition to the affidavit raised a factual issue precluding summary judgment
 
 
 [8]
 We have not considered the district court's finding of fair consideration as relevant to our conclusion that Jamison sufficiently called that issue into question to resist the motion for summary judgment. It is the function of the district court on summary judgment to determine whether any material issues of fact are presented for trial, not to resolve those factual issues on the papers submitted or upon its own knowledge. See Jaroslawicz v. Seedman, 528 F.2d 727, 731 (2d Cir. 1975); 6 J. Moore, Federal Practice P 56.15(3), at 2337 (2d ed. 1976)
 
 
 [9]
 In Jamison's brief responding to Peerless's motion for a protective order, Jamison stated:
 The deposition of Mr. Buckler with regard to the purported subsequent settlement between Miracle Mile and Peerless is even more significant, since no one connected with the plaintiff was privy to the conversations leading to that settlement. We believe, however, that the deposition will reveal that both Mr. Buckler and Mr. Rosenzweig (counsel for Miracle Mile) had knowledge which would vitrate (sic) the settlement.